IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK BURLEY,                          :
     Plaintiff                          :     CIVIL ACTION
                                        :
     v.                                 :
                                        :
JO ANNE B. BARNHART,                     :     No. 04-CV-4568
Commissioner of the                      :
Social Security Administration,          :
     Defendant                          :

REPORT AND RECOMMENDATION

TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE

     The Commissioner acknowledges that plaintiff Derrick Burley has experienced a "tragic" life situation most recently plagued by mental health problems and substance abuse. After a comprehensive review of the evidence, an Administrative Law Judge ("ALJ") issued a thorough decision concluding that Burley nevertheless could perform his past work involving light, unskilled jobs as a janitor or a locker room attendant. Although it is a close question, the ALJ's conclusion was supported by substantial evidence. I recommend that Burley's motion for summary judgment be DENIED and the defendant's motion for summary judgment be GRANTED.

     In doing so, I am mindful of Burley's traumatic childhood and a life often on the margins of our society. Although Burley has offered evidence in support of his claim -- and vigorously protests the ALJ's decision on appeal -- I credit the first-hand observations of the ALJ, who so carefully parsed the record and weighed the conflicting evidence, and the retained medical expert

who assessed Burley's testimony and his medical history.  The ALJ had substantial evidence to conclude that Burley could engage in an occupational program narrowly tailored to suit his needs, i.e., perform low-stress, unskilled work with minimal public contact, such as working as a janitor.

<u>PROCEDURAL HISTORY</u>

A.    <u>Overview</u>

The facts and procedural history are uncontested.

Burley's action was brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), who denied his application for disability insurance benefits ("DIB") and supplemental social security income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("Act").  42 U.S.C. §§ 401-433, 1381-1383f.  The Commissioner found that Burley retained the residual functional capacity ("RFC") to perform prior relevant work as well as a significant number of other unskilled, simple, low-stress jobs, despite his history of substance abuse and mental health problems.  An RFC is a multifaceted inquiry of what work-related abilities Burley retains in spite of his medical impairments

There is no dispute that Burley has severe impairments, consisting of major depression and, until July 31, 2003, a substance abuse disorder.  The ALJ concluded, however, that these impairments did not meet or equal the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4, Sections 12.04, 12.09.  Moreover, the ALJ made the following finding concerning how Burley's impairments restricted his work activities:

From the alleged onset date to July 31, 2003, the claimant's severe

2

> impairments restricted him to simple, routine, low-stress work
> involving low contact with others such as colleagues and the
> public; since then, depression has limited him to low-stress work
> involving low contact with others such as colleagues and the
> public.

After reviewing the entire record and hearing expert testimony from psychiatrist Richard

Saul, M.D.,[1] and vocational expert Mindy Lubec, the ALJ concluded that:

> Based on [these] residual functional capacities . . . and the
> claimant's age, educational background and work experience, the
> vocational testimony establishes that the claimant has been able to
> engage in prior relevant work and in occupations with significant
> numbers of jobs in the regional and national economies at all
> relevant times.

The hearing testimony and exhibits portray Burley, 35, as a man who has suffered

significantly in his brief life.  Before age five, he was the subject of physical abuse by his

stepfather and sexual abuse by an uncle.  He was also physically abused by his mother and then

endured years of foster care and group homes.

After a 35-day inpatient commitment to the Philadelphia Child Guidance Clinic in 1984

at age 15, Burley embarked on a checkered employment history, featuring more than fourteen

different jobs with multiple employers between 1994 and 2002.  These jobs included work as a

security guard, a porter at a private club, a houseman in a hotel, an office cleaner, and a cook's

helper.  Burley was not, however, treated for any mental health problems.  Indeed, there is an 18-

---

[1] Dr. Saul has vast experience in the mental health field, including current service as clinical director of the psychiatric division of the Philadelphia Court of Common Pleas and as clinical associate professor of psychiatry at Temple University.  He is board certified in psychiatry with 33 years experience.  (Tr. 109).  Burley stipulated to Dr. Saul's qualifications and raises no challenge to his expertise on appeal.

year void in his medical history.[2]  From age 11 until July, 2003, Burley abused alcohol and illegal drugs, primarily marijuana.  He is now drug free.  At the time of the hearing, Burley was living in a boarding house, where he was required to perform only minimal tasks.  He has one daughter, age 14, but apparently has minimal contact with her and does not provide support for her care.

Burley testified that a brush with the law in 2002 led to his current woes.  In December, 2001, he was accused of striking a coworker and was eventually arrested and charged with stalking the same coworker.  Burley served a jail term from February to May, 2002 for that offense, and entered a guilty plea in June, 2002 in exchange for a time-served sentence.  That episode, he said, caused his mental outlook to worsen to the point of seeking treatment at Crisis Center at Belmont on February 24, 2003 because of suicidal thoughts and depression.  At that time, he admitted consistent alcohol use, daily marijuana use, and tested positive for cocaine and marijuana.

Notes from his treatment at the Crisis Center feature myriad reasons and symptoms that led to Burley's visit, including: job loss, decreased concentration, suicidal ideation, memory lapses, feelings of worthlessness, decreased energy, increased appetite, crying spells, possible eviction, a break-up with his girlfriend, court-ordered child support payment for his daughter, and his release from prison more than seven months earlier.  He appeared neat, calm, cooperative, fully oriented, alert and had appropriate affect.  He was encouraged to make an appointment with Consortium, a psychiatric counseling center.  A follow up contact through Burley's cellular

---

[2] The record is unclear whether, as Burley claims on appeal, he needed treatment but did not seek it because he was either unable to do so or had given up on the health care system, or whether Burley did not actually require mental health treatment until 2002.  Regardless, it appears that Burley has had lifelong mental health issues stemming from his traumatic childhood.  Moreover, it is uncontested that notwithstanding whatever impairments may have existed during that 18-year period preceding his December, 2002 claim date, Burley was able to engage in substantial gainful activity.

telephone on February 25, 2003 confirmed that Burley had secured an appointment at Consortium and noted that Burley was "in the grocery store shopping for food." (Tr. 228). Burley was diagnosed with depression, bipolar disorder, and substance abuse. He received a global assessment of functioning score ("GAF") of 50, which represents a subjective determination on a scale of 1 to 100 of the clinician's judgment of Burley's overall level of function. A score of 41 to 50 indicates serious symptoms or serious impairments in social, occupational, or school functioning.

Burley was examined by John Howkins, M.D. at Consortium on March 3, 2003. Dr. Howkins completed a medical assessment form as required by the Pennsylvania Department of Public Welfare, deeming Burley temporarily disabled until March 4, 2004.[3] Dr. Howkins did not physically examine Burley, but based his diagnosis on a review of unspecified medical records and a clinical history. He estimated Burley's GAF score at 45-50.

On July 14, 2003, the Commonwealth of Pennsylvania directed Burley to undergo a consultative psychological evaluation with Charles Johnson, Ph.D. Burley arrived by public transportation and admitted recent use of both alcohol and marijuana. He said the only medication he was taking was Paxil, an antidepressant, which he had run out of about two weeks ago. Burley complained of depression and insomnia, and Dr. Johnson diagnosed an adjustment disorder with depressed mood and drug and alcohol abuse. Dr. Johnson concluded that Burley had no restriction in understanding and carrying out instructions and making simple, work-related decisions. He also noted that Burley had no restrictions interacting with the public, only

---

[3] After visiting the Crisis Center, Burley applied for welfare benefits from the Department of Public Welfare. (Tr. 136). I reference this fact only to explain Dr. Howkins' role in the medical chronology.

slight restrictions interacting with supervisors and coworkers, and moderate difficulties responding appropriately to work pressures.

In March, 2004, Burley's therapist, Mark Finichel, M. Ed., who examined Burley five times from November, 2003 to March, 2004, concluded that Burley had "marked" limitation in activities of daily living, social functioning and concentration, persistence and pace, and marked limitations in many categories of work-related mental functioning, even in the absence of substance abuse. As the ALJ noted, a "marked" limitation seriously interferes with the ability to function independently, appropriately and effectively. As such, it would be "incompatible with the ability to do any gainful activity" and eliminate the need for any additional assessment of functional limitations. See 20 C.F.R. Ch. III, Pt. 404, Subpt. P. App. 1 § 12.00-A. Finichel's determination followed a conclusion by Dr. Edwin Adom in February, 2004, that Burley would be disabled until February, 2005 due to depression.

Finichel's conclusions provide the strongest support for Burley's claim. (Tr. 240-68). He determined that under Part A of the Listings 12.04 (Affective Disorders) and 12.06 (Anxiety Related Disorders),[4] Burley had a disabling depressive disorder, featuring appetite disturbance, substantial sleep disturbance, psychomotor retardation with slow thinking, feelings of worthlessness, and difficulty concentrating. Under Part B, Finichel found, Burley suffered a

---

[4] The Listing of Impairments is a regulatory device used to streamline the decision-making process by identifying those claimants whose medical impairments are so severe that they would be found disabled regardless of their vocational background. Sullivan v. Zebley, 493 U.S. 521, 532 (1990). The Listing defines impairments that would prevent an adult, regardless of his age, education, or work experience, from performing "any" gainful activity, not just "substantial" gainful activity. See 20 C.F.R. §§ 404.1525a, 416.925a (2004) (purpose of the listings is to describe impairments "severe enough to prevent a person from doing any gainful activity"). The Listing was designed to operate as a presumption of disability making further inquiry unnecessary. Zebley, 493 U.S. at 532. To be found presumptively disabled, a claimant must satisfy the criteria under the Listing. Id. at 530.

marked restriction in his ability to perform activities of daily living, a marked difficult in

maintaining social functioning, and marked difficulties in maintain concentration or persistence

of pace.  Finichel also determined that Burley had functional limitations incompatible with the

residual functional capacity to perform sustained basic work activities at an unskilled level.

At the June, 2004 ALJ hearing, it was uncontested that Burley was taking "a four-drug

regime," (Tr. 36) consisting of Seroquel, an antipsychotic, Depakote, a mood stabilizer, Vistaril,

an antianxiety drug, and Trazodone, for his sleep disorder.  (Tr. 75-76).  Burley described himself

as "sad, isolated, alone and angry," and said he rarely takes public transportation because he is

"anxious, very nervous, isolated."  (Tr. 46).  He denied the ability to perform any job and said he

does not interact with others at his boarding house and claimed to have had violent episodes

about once per month.  Burley broke into tears during his attorney's opening statement, which

outlined his history of abuse as a child, and later unjustly accused the ALJ of making faces at him

during the hearing.  (Tr. 57).  While explaining his inability to engage in routine activities such

as attending church, dining in public, attending movies or concerts, Burley said he stopped such

activities "when the decompensation set it."  (Tr. 43).  This prompted the ALJ to inquire how

Burley, who had not graduated from high school, had "picked up" words such as

"decompensation" and "unsuccessful work attempt."  Burley said he had heard them in his

lifetime and had heard others use them.  He then proceeded to explain decompensation as

meaning "to slowly deteriorate."  (Tr. 43-44).

Dr. Saul did not examine Burley, but nevertheless disagreed with Finichel's diagnosis and

concluded that many of Burley's assertions, as well as those of other medical professionals, were

unsupported by the record.  Ultimately, Dr. Saul's conclusion was that until late 2003 Burley's

problem were significantly influenced by illegal drug use, and that for the following eight months

Burley's depression could have been influenced by "cleaning himself up and getting into a new

life pattern."  (Tr. 71; accord Tr. 66 (Burley is "just in the process of cleaning up from drugs")).

Dr. Saul said he did not believe Burley was housebound because the evidence demonstrated that

if he had to, Burley could leave his room.  He also noted that Burley had never entered a day care

program or hospital, which would be expected in cases of severe depression.

 To assess Burley's residual functional capacity, the ALJ posed the following hypothetical

based on Burley's past relevant work history:

> I'd like you to assume someone of this claimant's age, education,
> and other relevant background. . . . Simple, routine work, low
> stress as I defined it with [Dr. Saul]. . . . Minimal contacts with
> others. . . . Would such a person be able to engage in any of this
> claimant's prior work?

(Tr. 79).  The vocational expert then identified locker attendant, janitor, housekeeping cleaner

and prep cook.  She excluded Burley's former job as security guard because it was more than

"simple routine" work.  (Tr. 80).  If, however, the person could not tolerate even simple, routine

tasks on a sustained basis or minimal contact with others, and was unpredictable in attendance,

pace, and schedule, the vocational expert said the person could not perform any job.  (Tr. 81).

 The ALJ found that Burley was not disabled as defined by the Act.  The ALJ determined

that Burley had major depression, and a substance abuse disorder until July 2003, which were

severe impairments, but that his impairments were not of Listing-level severity.  (Tr. 15; 26,

Finding No. 2).  The ALJ found that from Burley's alleged onset date, December 30, 2002, to

July 31, 2003, his severe impairments restricted him to simple, routine, low-stress work

involving low contact with others such as colleagues and the public and that since then, his

depression had limited him to low-stress work involving low contact with others such as colleagues and the public. (Tr. 26, Finding No. 4). After considering Burley's residual functional capacity as well as his age, education, and past work experience, the ALJ found that Burley was capable of performing prior relevant work, except for his work as a security guard, as well as a significant number of other unskilled jobs. (Tr. 26, Finding No. 7). In the alternative, the ALJ determined that Burley could perform work that existed in substantial numbers under step 5 of the sequential test. The ALJ, therefore, denied Burley's claim. (Tr. 33). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Burley's request for review on September 14, 2001.

With respect to the dispute between Finichel and Dr. Saul over whether Burley met the required level of severity for a Listed impairment, the ALJ credited Dr. Saul's opinion based on the following summary:

* Restriction of Activities of Daily Living - moderate. Burley maintains grooming and hygiene, reads, watches television, writes poetry, travels on public transportation, speaks regularly with a friend. The boarding house staff does his household chores for him and Burley avoids social contact and often stays home;

* Difficulties in Maintaining Social Functioning - moderate. Burley avoids people, often stays home and left this most recent job because he could not tolerate the required contact with others. Nevertheless, he has a friend, until February, 2003 had a girlfriend, and gets along with residents in his boarding home. There have been no unusual conflicts since March, 2003, despite Burley's claims. Thus, Dr. Saul concluded, Burley can tolerate ordinary contact with others.

* Deficiencies of Concentration, Persistence or Pace - moderate until July, 2003 and mild

since then.  The moderate listing is based on Burley's period of substance abuse.  Since then, he

has had improved concentration, performed the serial "7s" test, reads books, magazines and

newspapers, watches television and manages money.

       * Episodes of Deterioration of Decompensation - none.

       Dr. Saul concluded that Burley also failed to satisfy any of the criteria under subsection C

of the Listings, that is, he suffered no repeated, extended episodes of decompensation, he has no

residual disease process that increased mental demands or changes in his environment would

cause him to decompensate, and has not needed a highly supportive living arrangement to

function.

       All of Dr. Saul's assessments were contradicted by Finichel, who concluded that Burley

had "marked" limitations in all areas of functioning.  The ALJ cited eight reasons for placing

"great weight" on Dr. Saul's hearing testimony: (1) his status as a board-certified psychiatrist; (2)

his status as an independent medical expert with extensive experience; (3) his review and

assessment of all medical evidence; (4) he heard and evaluated the claimant's hearing testimony;

(5) his extensive familiarity with the Social Security Administration's criteria for evaluating

disability under the Listing sections and for determining residual functional capacity; (6) his

carefully explained and well grounded opinions in the treating medical source documentation,

which were consistent with Dr. Johnson's conclusions; (7) his opinions were not substantially

contradicted by other medical evidence, apart from treating source opinions; and (8) his opinions

conformed with the ALJ's own impression of claimant's level of functioning.[5]

_____

[5] In the heat of litigation, Burley makes the unfortunate accusation that, by relying on the testimony of Dr.
Saul to deny disability, the ALJ actually "ceded" his responsibility as an independent judicial officer.  This assertion
is undermined, however, by Burley's related claim that the ALJ's questions, which challenged and probed Dr. Saul's

<u>DISCUSSION</u>

A.  <u>Legal Standards</u>

I must determine whether substantial evidence supports the Commissioner's final decision.  42 U.S.C. § 405(g); <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005); <u>Plummer v. Apfel</u>, 186 F.3d 422, 427 (3d Cir. 1999).  The factual findings of the Commissioner must be accepted as conclusive, provided that they are supported by substantial evidence.  <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971) (citing 42 U.S.C. § 405(g)); <u>Rutherford</u>, 399 F.3d at 552.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson</u>, 402 U.S. at 401 (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)); <u>Reefer v. Barnhart</u>, 326 F.3d 376, 379 (3d Cir. 2003).  It is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence."  <u>Rutherford</u>, 399 F.3d at 552.  I may not weigh the evidence or substitute my own conclusions for that of the ALJ.  <u>Burns v. Barnhart</u>, 312 F.3d 113, 118 (3d Cir. 2002).  If the ALJ's findings of fact are supported by substantial evidence, I am bound by those findings, even if I would have decided the factual inquiry differently.  <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001).  At the same time, however, I must remain mindful that "leniency [should] be shown in establishing claimant's disability."  <u>Reefer</u>, 326 F.3d at 379 (quoting <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979)).

The Social Security Administration has adopted a system of sequential analysis for the evaluation of disability claims.  This five-step evaluation is codified at 20 C.F.R. §§ 404.1520,

---

conclusions, actually prove that Dr. Saul's views lacked evidentiary support.  Even assuming reasonable minds could differ on the merits of the ALJ's ultimate decision, he faithfully performed his duties, conducted a fair hearing, and thoroughly explored the many difficult issues raised in this matter.

416.920.[6]   A claimant is disabled if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1520, 416.905.  The claimant satisfies his burden by showing an inability to return to her past relevant work.  Rutherford, 399 F.3d at 551.  Once this showing is made, the burden of proof shifts to the Commissioner to show that the claimant, given his age, education, and work experience, has the ability to perform specific jobs that exist in the economy.  20 C.F.R. §§ 404.1520, 416.920; see Rutherford, 399 F.3d at 551.

The ALJ may not make speculative inferences from medical evidence, see e.g., Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981), but may reject conflicting medical evidence. Williams v. Sullivan, 970 F.2d 1178, 1187 (3d Cir. 1992).  When a conflict in the evidence exists, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the

---

[6]These steps are summarized as follows:

1.  If the claimant is working or doing substantial gainful activity, a finding of not disabled is directed.  If not, proceed to Step 2.  20 C.F.R. §§ 404.1520(b), 416.920(b).

2.  If the claimant is found not to have a severe impairment which significantly limits his or her physical or mental ability to do basic work activity, a finding of not disabled is directed.  If there is a severe impairment, proceed to Step 3.  20 C.F.R. §§ 404.1520©, 416.920©.

3.  If the impairment meets or equals criteria for a listed impairment or impairments in Appendix 1 of Subpart P of Part 404 of 20 C.F.R., a finding of disabled is directed.  If not, proceed to Step 4.  20 C.F.R. §§ 404.1520(d),  416.920(d).

4.  If the claimant retains residual functional capacity to perform past relevant work, a finding of not disabled is directed.  If it is determined that the claimant cannot do the kind of work he or she performed in the past, proceed to Step 5.  20 C.F.R. §§ 404.1520(e), 416.920(e).

5.  The Commissioner will then consider the claimant's residual functional capacity, age, education, and past work experience in conjunction with the criteria listed in Appendix 2 to determine if the claimant is or is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).

See also Knepp v. Apfel, 204 F.3d 78, 83-84 (3d Cir. 2000) (citing Santise v. Schweiker, 676 F.2d 925, 926-27 (3d Cir. 1982)).

wrong reason." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993); accord Morales v. Apfel,

225 F.3d 310, 317 (3d Cir. 2000).  The ALJ must consider all the evidence and give some reason

for discounting the evidence he rejects.  See Stewart v. Secretary of H.E.W., 714 F.2d 287, 290

(3d. Cir. 1983).

 The regulations provide that a treating physician's opinion is entitled to controlling

weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques

and is consistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2) (2004).  Although the treating physician's conclusion should be accorded great

weight, it may be rejected if it is unsupported by sufficient clinical data,  Newhouse v. Heckler,

753 F.2d 283, 286 (3d Cir. 1985), or contradicted by other medical evidence.  Plummer v. Apfel,

186 F.3d 422, 429 (3d Cir. 1999).  "While the ALJ is, of course, not bound to accept physicians'

conclusions, he may not reject them unless he first weighs them against other relevant evidence

and explains why certain evidence has been accepted and why other evidence has been rejected."

Kent v. Schweiker, 710 F.2d 110, 115 n.4 (3d Cir. 1983).  Thus, the ALJ may choose to reject a

treating physician's assessment if it conflicts with other medical evidence, the ALJ clearly

explains his reasons for rejecting the assessment, and he makes a clear record of his decision.

See generally Rivera v. Barnhart, 2005 WL 713347 at *5 (E.D. Pa. March 24, 2005) (Giles, C.J.)

(collecting authorities); see generally Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).  A

physician's estimated global assessment of functioning score ("GAF") of a claimant's overall

level of functioning ability may assist the ALJ, but is not essential to resolution of the claim.

Howard v. Commissioner, 276 F.3d 235, 241 (6th Cir. 2002).

 Similarly, the ALJ must seriously consider subjective complaints of pain, which may

support a claim for benefits, especially when the complaints are supported by medical evidence.
Smith, 637 F.2d at 972; Taylor v. Harris, 667 F.2d 412 (3d Cir. 1981); see also Mason v. Shalala,
994 F.2d 1058, 1067 (3d Cir. 1993).  A medical report not based on a personal examination by
the physician is accorded less weight.  Nelson v. Heckler, 712 F.2d 346, 348 (8th Cir. 1983).

    Although the fact finder's credibility determinations are normally entitled to deference, I
must nevertheless exercise meaningful review.  Cao v. United States, No. 03-4256, slip op. at 8
(3d Cir. May 12, 2005).  The reasons for credibility findings must be substantial and bear a
legitimate nexus to the finding, e.g., based on inconsistent statements, contradictory evidence, or
inherently improbable testimony.  Id.

    B.  Analysis

    The essence of Burley's claim is that he mentally "decompensated" and could "no longer
function at all" as of December, 2002, shortly before he sought treatment at the Crisis Center in
February, 2003.  (Reply Br. at 7 n.4 (emphasis in original); accord Tr. 35 ("and then all the
demons came back")).  He claims his debilitating depression was triggered by a series of events
stemming from his May, 2002 imprisonment for stalking a former coworker.  Yet, as the ALJ
noted during the June 23, 2004 hearing, the issue in Burley's case "is not so much why, but
what," (Tr. 55), a reference to the need to explore Burley's impairments and their resulting
limitations, not dwell on the origins of those impairments.  The Commissioner, meanwhile,
labels this matter nothing more than a "straight forward case where the claimant's impairments,
even when considering his history of alcohol and drug abuse, would not prevent him from
working."  (Def's Br. at 15 n.3).  As the Commissioner cautions, my role is to assess the record
for substantial evidence, not substitute my judgment for that of the ALJ, who observed the

14

witnesses, the claimant, and reviewed the medical evidence with the assistance of a highly qualified expert.

The ALJ concluded that despite significant impairments Burley could continue to perform the same types of low-stress, unskilled work he had performed between 1984 and 2002.  During that period of sustained work, albeit with high job turnover, the ALJ noted that Burley was abusing alcohol and illegal drugs.  Now, free of drugs, the ALJ has determined, Burley is capable of resuming his past work.   Burley, however, accuses the ALJ and the Commissioner of misstating the record and virtually ignoring all evidence and medical history supporting Burley's contention.  Moreover, as Burley correctly notes, the Commissioner faces a substantial burden defending a disability denial that rejects all evidence from multiple treating sources.

A starker contrast in positions is hard to imagine.  As in most cases, the truth is somewhere amidst those two extremes.  For the following reasons, I recommend that the ALJ's findings be affirmed.

As Burley frames the issue, an ALJ could never reject a disability claim by relying on an independent medical advisor who contradicts opinions from treating sources.  (see, e.g. Reply Br. at 11 ("medical advisor's opinion can never be substantial evidence on which to deny disability").  That view is based on the premise that the medical advisor's opinion is totally uncorroborated and without support anywhere in the record.  Yet, Burley's repeated incantation of the "treating physician doctrine" is not a talisman dictating a finding in his favor.  As the cases cited by Burley recognize, the ALJ may choose whom to credit, as long as he supports his decision with valid reasons and does not make speculative interpretations or inject improper lay opinion.  See Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429 (ALJ may reject treating

physician opinion based on contrary medical evidence or may give it some weight depending on extent of physician's supporting explanations).

The rationale for giving less weight to evidence from non-treating medical professionals has evolved over time and appears to originate from judicial concern that: (1) medical advisors had not seen or examined the claimant; (2) medical advisors would opine on issues not addressed by the treating physicians; and (3) medical advisor reports constitute double hearsay since the advisors did not testify and had not had their conclusions tested under cross-examination.  The latter two factors implicate a concern that medical advisory reports had a degree of unreliability as a matter of evidentiary law.  See Evosevich v. Consol. Coal Co., 789 F.2d 1021, 1027 (3d Cir. 1986).  Here, however, Dr. Saul, the medical advisor, limited his role to reviewing the record and opining on the precise issues addressed by the treating physicians.  Moreover, Dr. Saul testified at the ALJ hearing and was subjected to a probing and skilled cross-examination by Burley's attorney.

To be sure, medical advisory testimony is presumptively afforded less weight because the advisor has not personally examined the claimant.  Common sense and the regulations require as much.  See 20 C.F.R. § 404.1527.  Yet, objective medical evidence from advisors, like Dr. Saul, who are highly qualified and conduct a reasoned interpretation of medical evidence gathered by examining physicians, may be credited as long as the ALJ explains his rationale and finds support in the record for his choice.  Such opinions may have "probative value worth supporting substantial evidence."  Evosevich, 789 F.2d at 1028.  If, as here, the ALJ cites to contradictory medical evidence, which has some support in the record, he is not compelled, as Burley asserts, to adopt the assessment of the treating source.  See Plummer, 186 F.3d at 429; Jones, 954 F.2d at

129.

In reaching this conclusion, the United States Court of Appeals for the Third Circuit cited persuasive legal authority that supports this view.  Evosevich, 789 F.2d at 1027 (Rodriguez v. Secretary of Health & Human Services, 647 F.2d 218, 224 (1st Cir. 1981)).  In Rodriguez, now-Justice Breyer recognized that an ALJ is not required to treat medical advisory evidence as having no evidentiary weight.  Rather, he explained, such evidence may be given whatever weight the circumstances suggest, with the caveat that it cannot – without something more – constitute substantial evidence.  Id.  Thus, Burley's attempt to marginalize the role of a medical advisor has no basis in law and would render independent medical advisors meaningless in the context of ALJ disability hearings.

The cases relied upon by Burley fail to support his position and their factual postures stand in sharp contrast to this case.  For example, in Dorf v. Secretary, 794 F.2d 896 (3d Cir. 1986), the claimant had endured a "long and tortured" 20-year disability claim process plagued by inconsistent rulings by the ALJ.  Id. at 902.  The claimant was a multiple sclerosis victim who presented undisputed medical evidence to support her claim, including a five-year history with her treating physician and corroborating evidence from a neurologist.  Id.  The Court noted that in relying on the medical advisor, the ALJ had ignored evidence that multiple sclerosis is "episodic" in nature and has symptoms that vary as the debilitating disease progresses.  Similarly, in Caballero v. Commissioner, 2003 LEXIS 19485 (E.D. Pa. 2003) (Yohn, J.), the ALJ engaged in minimal analysis and failed to consider whether the claimant's disability met the Listing criteria.  The ALJ failed to explain how he had weighed the conflicting evidence, thus making it impossible for the court to determine whether the ALJ had properly considered the evidence.

17

The court noted that the ALJ's rejection of the treating physician's medical opinion was based on the ALJ's misunderstanding of the nature of the disease.  Thus, the case was remanded to allow the ALJ to give further support for why he had discredited the treating physician's opinion.  Id.

Here, the ALJ carefully examined all of the evidence and concluded that Dr. Saul's assessment was corroborated by the testimony of Dr. Johnson, who had also concluded that Burley did not suffer from any "marked" limitations.  (Tr. 184).  This assessment is also supported by the treatment note of Dr. Adom on February 18, 2004, who said Burley denied being depressed, his mood was bright, he slept good, and he had no problems with impulse control and no panic episodes.  Dr. Adom concluded that Burley was "doing well on current meds and dosage regime."  (Tr. 260).  This evidence, without more, is sufficient to constitute substantial evidence to support the ALJ's decision.  Although a different judicial officer could have drawn a different conclusion, the ALJ's determination was not unreasonable or without foundation in the record.  Moreover, the ALJ carefully delineated his reasoning and addressed each of Burley's challenges.

For example, the ALJ explained why he gave no weight to Burley's form medical assessment documents, such as those submitted by Dr. Howkins.  As the ALJ noted, such evidence is weak at best.  Mason, 994 F.2d at 1065.  Moreover, Dr. Howkins never examined Burley[7] and it is unclear which medical records he reviewed in reaching his conclusions after taking Burley's clinical history.  (Tr. 164, 179).

---

[7] Although Burley challenges this assertion on appeal, the record clearly states that Dr. Howkins evaluation is not based on an examination.  Moreover, Burley had the opportunity at the hearing to offer evidence that Dr. Howkins did examine him, but failed to so.  Burley also contends that if Dr. Howkins' assessment as a non-examining physician is weak evidence, then Dr. Saul's assessment suffers from the same defect.  As the ALJ noted, however, Dr. Saul thoroughly reviewed all of the medical evidence, is a highly regarded psychiatrist, carefully observed Burley during the ALJ hearing, and was subject to cross-examination.

Similarly, the ALJ justified his decision to give limited weight to the assessment of Burley's therapist, Mark Fenichel, who answered  interrogatories citing "marked" limitations in all activities of daily living, social functioning and concentration, persistence and pace, and many areas of work-related mental functioning.  (Tr. 240-43).  In rejecting Fenichel's assessment as "unconvincing," the ALJ cited to Burley's continued participation in various activities, such as reading, watching television, using public transportation, maintaining his grooming, seeing a friend, writing poetry, and managing money.  Moreover, the ALJ noted that unlike Dr. Saul, Fenichel was a therapist and not a board-certified  psychiatrist with a medical degree.  See 20 C.F.R. § 404.1527(d)(5) (more weight is generally given to a specialists); Mason, 944 F.2d at 1066-67 (when opinions are in conflict, the opinion of the medical specialist "would seem to deserve greater deference").  This latter fact is sufficient to give more weight to Dr. Saul's interpretation that Finichel's notes and Burley's medical history failed to justify a finding that Burley's limitations were "marked."

Burley maintains that the activities cited by Dr. Saul and the ALJ as justifying his functional capacity do not constitute the life of an active, engaged person who can function everyday in the workforce.  He contends his activities are minimal and portray someone barely involved in day-to-day life.  The ALJ and Dr. Saul, he maintains, improperly have set a standard that would allow disability awards only if the claimant is "precluded" from all activity. Preclusion, of course, is not the test.  As Burley properly notes, to find a "marked" limitation, the ALJ need only determine that the degree of limitation "is such as to interfere seriously with [the] ability to function independently, appropriately, effectively and on a sustained basis.  See 20 C.F.R. Ch. III, Pt. 404, Subpt. P. App. 1, § 12.00-C (assessment of severity).

Here, Burley acknowledged his ability to engage in such activities and the record establishes that even after he claims to have "decompensated" he was able to function on a sustained basis at his boarding house.  Moreover, within days of his February, 2003 visit to the Crisis Center -- which the record suggests was likely his "lowest" point -- Burley was able to leave his residence to shop for food and engage in conversation on his cellular telephone.  (Tr. 228).  Reference to such facts is not meant to suggest, as Burley appears to argue, that a claimant must be a home-bound recluse to obtain disability benefits.  Rather, it is intended to demonstrate that the ALJ's decision was reasonable and fact-based.  A careful review of Burley's testimony confirms the ALJ's conclusion -- reached with assistance from Dr. Saul -- that Burley had sufficient functional capacity to engage in substantial gainful activity.

For example, Burley said that using public transportation makes him "anxious, nervous, and isolated."  The experience of public transportation is unpleasant and stressful for many daily commuters.  Burley, like many in society, apparently is able to endure the process when he is required to do so.  The absence of more than a few citations to Burley's use of public transportation in the record is not dispositive, as Burley contends.  The fact remains that Burley was able to engage in traveling in public and has been able to function in that capacity both before and after December, 2002.  He is not, as he claims, a recluse unable to function as a working member of society.  Moreover, Burley's unprompted use of medical terms of art, such as "decompensation" (Tr. 43), was sufficient to further support the ALJ's doubts as to the true extent of Burley's inability to function even in low-stress, unskilled jobs.

Similarly, Burley attempted to convince the ALJ that if he lived by himself, and not in a boarding house, he "probably" could not perform basic household chores for himself.  When

20

pressed, however, he acknowledged that he would try his best to perform tasks such as cooking, cleaning up, and washing dishes.  (Tr. 41-42).  Nothing in the medical record supports Burley's claim that he cannot perform basic self-help tasks such as caring for his daily needs.  He was never hospitalized in his adult life and his post-2002 treatment notes fail to hint at any debilitating condition that would render Burley as limited as he attempted to portray himself.   As Dr. Saul noted: what does it mean, absent documented medical evidence, that someone would not perform household chores? (Tr. 62).  Dr. Saul reached a similar conclusion on Burley's undocumented claim that he does not leave his room, except "when he has to."  As Dr. Saul noted, "[t]he question is when he doesn't have to.  If he had to, I believe he could leave the room."  (Tr. 72).  Sufficient evidence exists to support Dr. Saul's conclusion.

Dr. Saul also rejected Burley's claim that his violent tendencies constituted a "marked" impairment in social functioning.  Burley had advised the ALJ that he could not even perform a job in which he could work slowly at his own pace with no demand for a great deal of production.  As the ALJ described it, the hypothetical job would consist of:

> simple work . . . in which you don't see other people very much.  Basically, you'd
> be on your own.  Now and then you might have to talk to your boss.  You might
> even be in the same room with a few other people, but you'd be working on your
> own.  And the job would not put a lot of strain or stress on you.

(Tr. 51).  Burley said he could not perform under such conditions, explaining that "sooner or later there's going to be some trouble" such as a fight or argument with his boss or a coworker.  Id. To support his answer, Burley estimated that within the past eighteen months he had been involved in two violent episodes with others, and that until January, 2004 he had been involved in violent incidents "maybe once a month."  When pressed, however, Burley acknowledged he

was "getting there" in terms of maintaining his self-control. (Tr. 49-50).

Dr. Saul's skepticism of Burley's response was credited by the ALJ, who also observed Burley as a witness. The ALJ expressly challenged Dr. Saul to explain how someone who engaged in acts of violence once per month would not have a "marked" limitation in social functioning. In response, Dr. Saul explained:

> I have no documentation of once per month. I have no documentation of that. It may be . . . he's irritable. It may be people talk to him wrong in his neighborhood. He lashes out. I don't know. I couldn't see. But I don't see anything in the record documenting that amount of violence. Now, there was, when he was a youngster.

(Tr. 63). Dr. Saul then noted that Burley's past behavior through July, 2003 was also likely influenced by his drug use.[8]

The ALJ's resolution of this issue was not unreasonable and was supported by substantial evidence. Burley's medical record since 1984 includes no reference to any violent episodes or treatment for such behavior. Indeed, Burley claimed that the stalking incident that led to his imprisonment did not involve any threats or violence, (Tr. 54-55), and acknowledged that since the end of 2003, his efforts to maintain self-control were improving. (Tr. 49-50). Moreover, both Dr. Saul and the ALJ observed Burley testify and declined to credit his claim despite a brief crying spell when his history of childhood abuse was mentioned and an outburst of anger after Dr. Saul attributed many of Burley's past problems to drug use. The ALJ made a specific

---

[8] Burley counters that two facts disprove Dr. Saul's interpretation: (1) Burley was drug-free from July, 2003 to May, 2004; (2) during that period he continued to suffer the same disabling mental impairments as he suffered while he was abusing drugs; therefore, Burley's drug abuse before July, 2003 "was not a material contributing factor" to Burley's ongoing mental disability and Burley has been disabled his entire life. (Pl. Mot. at 25). Such a conclusion is not inevitable. Burley had apparently abused drugs and alcohol for much of his life and was able to function, at least to some degree, for many years until his 2002 arrest. Moreover, Burley's problems appear to have been aggravated by other life factors, such as his break-up with his girlfriend, problems with his daughter, and his possible eviction. Finally, the ALJ recognized Burley's continued impairment in crafting a narrow category of jobs that Burley can function within.

adverse credibility finding on this point and no reviewing court is competent to substitute its judgment under those circumstances, especially when the ALJ explains a logical basis for his finding.  See Cao, No. 03-4256, slip op. at 8.[9]

Burley also contends that the ALJ erred by not giving sufficient weight to his two GAF scores that were below 50.  These scores, he contends, are strong evidence corroborating the various treating source medical diagnoses that support his claim.  GAF scores, however, are a clinician's subjective judgment of Burley's overall level of functioning at that particular time. Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004).  Although the GAF assessment may assist the ALJ in formulating Burley's capacity to function, i.e., what a claimant can do, not what maladies he suffers from, it is not essential to the determination.  See Howard, 276 F.3d at 241 (affirming ALJ failure to reference four different GAF reports in determining claimant's RFC).

Here, the ALJ expressly considered the GAF scores.  He acknowledged that two treating sources had assigned Burley GAF scores of 40 to 50 in early 2003, but rejected them in determining Burley's RFC.  The ALJ credited Dr. Saul's opinion that the GAF scores were unreliable, failed to constitute scientific assessments of mental functioning, and were not supported by the treatment notes.  The ALJ noted that the GAF scores were more reflective of Burley's symptoms and not Burley's capacity to function.  Finally, he concluded that the scores

---

[9] The ALJ also cited Burley's lack of credibility on the precise dates of his last period of drug abuse.  The record, however, supports Burley claim on appeal that this resulted from confusion on the dates.  Burley did, however, attempt to minimize or conceal his drug abuse.  For example, on January 30, 2004, his treating physician, Dr. Adom, noted that he must check Burley's history of substance abuse.  (Tr. 259).  This notation supports the ALJ concern that Burley was sometimes less than candid about his drug abuse history.

In any event, the ALJ's decision is supported by other substantial evidence even if I were to find that the ALJ erred in making an adverse credibility finding concerning Burley's testimony on the dates of his drug abuse.

were issued on days when Burley had broken up with his girlfriend and after substance abuse, thereby suggesting that in light of those episodes, Burley's functioning level may have been diminished.

The ALJ's rationale is not unreasonable and is supported by substantial evidence, i.e., the testimony of Dr. Saul, an experienced psychiatrist, and by the absence of supporting medical documentation.  Dr. Howkins' GAF estimate was a conclusory entry made without examining Burley.  As the ALJ noted, Dr. Howkins is arguably not even a treating source.  In any event, Burley overstates his case when he claims that Dr. Howkins' evaluation was based on a "comprehensive medical examination."  (Reply Br. at 9; compare Tr. at 252-57 (Dr. Howkins' notes).  The other GAF score (40) was assigned by the Crisis Response Center upon Burley's initial intake in February, 2003 when he tested positive for cocaine and marijuana use.  Although hospitalization was noted as part of Burley's treatment plan, (Tr. 224), no subsequent treating sources addressed the issue of in-patient treatment and Burley apparently did not request it.  Thus, the ALJ properly balanced all medical evidence, including the GAF scores in 2003, to conclude that Burley had a functional capacity to engage in limited work activity.

Finally, Burley claims that Reider v. Commissioner, 115 F. Supp.2d 496 (M.D. Pa. 2000), establishes as a matter of law that the ALJ in this case improperly considered Burley's ability to engage in limited activities to deny him benefits.  (Pl. Mot. at 72).  Burley's reliance on Reider is misplaced.  First, as a factual matter, the ALJ identified Burley's activities in the context of determining whether his impairments were only "moderate" or "marked."  The regulations required as much.  Second, the examples cited by the ALJ were illustrative of why in the view of medical professionals --  Dr. Saul and Dr. Johnson – Burley had only limited impairment in those

areas.   Finally, <u>Reider</u> involved an egregious situation in which the ALJ had violated an admonition from the Third Circuit and made his disability determination based on his subjective determinations on a "psychiatric review technique form."  <u>Id.</u> at 502.  In addition, the court concluded that the medical evidence relied on by the ALJ to deny benefits actually supported the conclusions of the treating physicians that the claimant was disabled.  <u>Id.</u> at 502.

Burley presents a plausible claim for disability, but I find that the ALJ appropriately assessed his contentions, carefully reviewed the evidence, and reached a reasonable decision supported by substantial evidence.

Accordingly, I make the following:

# **R E C O M M E N D A T I O N**

AND NOW, this          day of June, 2005, IT IS RESPECTFULLY RECOMMENDED that plaintiff's motion for summary judgment be DENIED and defendant's motion for summary judgment be GRANTED.

BY THE COURT:

_____
TIMOTHY R. RICE
U. S. MAGISTRATE JUDGE